Congratulations to both of you. Our first case this morning is Healthier Choices Management Corporation v. Philip Morris, 2023-15-29. Mr. Fischer. Good morning and may it please the Court. The Board first erred by finding anticipation based on new figures that Philip Morris created instead of confining its analysis to the four corners of the Hamill publication. And second, the Board erred by applying a written description standard that requires explicit disclosure of a claim limitation when Philip Morris' own expert confirmed that those skilled in the art would have read the 170 patent specification to support HCNC's proposed amendments. The Board applied the incorrect standard in both of these contexts, and this case provides an excellent opportunity for this Court to confirm the distinctions between the standards for analyzing the sufficiency of a disclosure. The final written decision should be reversed. The only claim limitation at issue requires not only that the pipe include a heating element, but specifically requires that the heating element be fixed within the combustible material reservoir. In its petition, Philip Morris argued anticipation not based on Hamill's limited disclosure, but instead based on mock-ups that Philip Morris created from Hamill's figures. What about the expert testimony? I mean, I read the expert testimony, I think it's of Mr. Devey, on this anticipation issue, and it looked very thorough to me. It looked like it was relying on not just the figures, but also statements in the abstract, statements that were made in the claims of Hamill that tied it all together and explained why it was that that wire would be located in the porcelain tube where the tobacco is and fixed there. This is the NIDAC case. This is the Board filling in limitations based on inferences and based on what the person skilled in the art or the expert at once envisioned, and that's not sufficient. I don't see where the Board used the language that was criticized in NIDAC, which, by the way, I don't even see where NIDAC applies here because it's relying on the at-once envisioned doctrine in Kennemedal, which doesn't seem to have anything to do with the circumstance here, in my view. So I'm just wondering, what about the expert testimony, which seems to be a little more fulsome? You were talking about the Board only relied on figures, but I saw the Board also relying on the expert testimony and more than just the figures. Do you agree with that or no? I do agree with it, but it relied on what the expert inferred from the mock-ups, not the figures themselves. And the mock-ups were essential to the analysis. The mock-ups do not show. What about where he said, I only had the mock-ups because I wanted to show how a person of ordinary skill in the art would, relying on all this other evidence, like I said, the abstract, the claims, how the figure 1, 2, figure 1 also shows that wire and shows how it's connected to things. He said, I did this so I could show it, not to create new evidence. Why isn't that something that the Board could credit? The figure itself does not sufficiently disclose the precise location of the heating element. It does not say that it is within the porcelain tube where the tobacco is. It could be embedded in the porcelain. It could be below the porcelain and heat the porcelain so the porcelain heats the tobacco. It could heat the air that comes into the device. Hamel says nothing about the air flow through the device. The Robinson device that was asserted also for anticipation, indirect heating, and this is all throughout this art for electronic cigarettes. You heat the air. You put the air into the tobacco. The air combusts the tobacco or causes an aerosol to be formed that is inhaled. There are a host of different ways that this could be arranged. Hamel, the disclosure of Hamel is essentially a paragraph. That's it. This is the entire disclosure. You don't have to look at the claims, right, in the abstract?  The abstract says that the wire, don't you have to look at the abstract as well as the claims? The abstract says that the wire, I think, is where the tobacco is, right? There's inferences to be made. I'm just questioning your statement right now that there's only a paragraph to look at. I thought that when I looked at it, there was language in the abstract. There is, of course, only a two-paragraph description. You're right. But also, can't you look at what the claims say in Hamel to understand what it's describing? That's part of Hamel's disclosure, isn't it? Yes, you can look at everything. But the error here is that Theracense requires express or inherent disclosure. At best, they're making an inherency argument, which they didn't make at the Board. So that's waived. And that's a whole different standard. So they're left to show that Hamel expressly discloses the heating element fixed in the combustible material. And that's what their expert says. Their expert says one of skill in the art looking at it would see it there, that the heating element is fixed where it needs to be. What case do we have that says the Board can't rely on that kind of testimony? That merely conclusory testimony is insufficient to carry the day. Maybe you think it's conclusory. But let's say for the sake of argument, it's not conclusory. Is there something wrong with relying on an expert to tell us what one of skill in the art would see in this patent, including the figures, the claims, the specification? Because I'm not one of skill in the art. I don't know what one of skill in the art would see looking at that patent. But the expert presumably does. An expert persuaded the Board that this is expressly in Hamel. So, again, this is simple technology. And I think just looking at the figures, there is not sufficient evidence to say that it is within the combustible material reservoir. That's hindsight, and that's litigation-induced, and there's nothing to point at in Hamel itself. And, you know, again, the NIDAC case says you can't fill in limitations. Well, that's just arguing that evidence is not persuasive to you. My question is, is there something procedurally wrong with the Board being persuaded by an expert who says, this is what I see, this is what a person of skill in the art would see in this prior art reference? I think that you can be persuaded by it, but at the end of the day, in an anticipation analysis, and again, this is why I think this case provides a great opportunity, in an anticipation analysis, what that expert should be testifying to is, here's where Hamel expressly discloses that the element is within the combustible material reservoir. I think it could be there. You wrote in your gray brief at 11 and 12 that Dr. Deavy actually conceded that Hamel does not expressly disclose that structure. Where does Dr. Deavy concede that Hamel does not expressly disclose the challenge structure? The fact that they, Philip Morris and Dr. Deavy, was required to create his own versions of figures. You say, I'm sorry, can you point me to where in the deposition he concedes that Hamel does not expressly disclose the structure? Because that's what you wrote at page 11 of the gray brief. I think we have a site to it. There's a site where I asked him, where are the holes? He went to say that it's going to be, the heating element is going to be placed in holes, and the holes will protrude down, and the heating element will connect to the battery. I think you're referring to 3431. Why don't you take a look at that? Yes. I asked him, my question is, Hamel does not describe any holes in the bottom half of the porcelain tube, does it? Talking about Hamel. We're talking about the structure here, and how he sees the heating element arranged within the porcelain tube. He says, okay, Hamel does not describe the way he stated that it has holes in the pattern. He was being very resistant, and we worked very hard to get him to say, none of this testimony. Which is why I want to know, is that what you're relying on as his supposed concession? The level of detail that he provided in his declaration was not found in Hamel, yes. For the structure of the device. Okay, thank you. There's simply no description in Hamel as to how the device might be assembled. Figure three does not show even the control electronics, where the heating element would have to be connected to. The board found that Hamel had more detail than the 170 pattern because of figure one. But what figure one does is demonstrate that figure three, which shows how the thing is put together, is missing all the electronics. There's not even a circuit board shown in figure three. Can I ask you another question? In his report, this is again his declaration, Mr. Deavy, he says a person of ordinary skill and merit would understand that if the heating wire were not fixed within the porcelain tube, as it is shown to be in figures two and three, it would not be able to burn the tobacco that is placed inside the porcelain tube. Why isn't that additional substantial evidence to support the board's finding here? I think our expert countered that by saying there are other ways of heating it. But again, the issue is substantial evidence and whether a reasonable fact finder could find, as the board did here, relying on the expert testimony of Mr. Deavy. I think it concludes your testimony. There's simply nothing in Hamel. Again, we're talking about anticipation. I don't think that the expert can lower the standard for anticipation. The substantial evidence, you have to have substantial evidence still that Hamel itself expressly discloses the location of the heating element. And I don't think there's anything in Deavy's testimony that says there it is in Hamel, there's express disclosure that the heating element must be fixed within the combustible material reservoir. It's simply not there. Counsel, you're into your rebuttal time. You can continue or save it. Did you want to say anything about the written description issue? I would just say with respect to the written description issue, it's kind of the problem in reverse where the board put on us a requirement to say that the location of the aperture must be precisely identified within the disclosure. And that's not the requirement of AREOT. AREOT said the disclosure is reviewed by one skilled in the art. Dr. Deavy himself admitted that those skilled in the art would understand that you would not permit the air to flow through the electronics. So when Dr. Deavy pointed to the connector as being the aperture, that makes no sense. There's no disclosure in the 170 patent specification that would say that there's an aperture through the connector, an aperture through the connector on the first pipe section, an aperture through the LED to permit the air to flow through the electronics. None of that is in there. And one skilled in the art would have understood that the aperture and pathway for the air would have been limited to the second pipe section. You can give me the site when you come back on rebuttal, but you just said Deavy conceded that one skilled in the art would know that the air would not flow through the electronics. If you can give me that page tonight when you come back, I'd appreciate it. Yes. Thank you. Mr. Bell. Good morning, Judge Lori, and may it please the Court. Gabe Bell for the Apple East. The issues here are substantial evidence. On both the anticipation and the written description, the question is whether the Board had substantial evidence for its conclusions, and we submit that on both there was ample evidence. I'll turn first to the anticipation question because that's what my friend spent most of his time on. As the Court has noted, there is not just the figures here. There are portions of the abstract, portions of the claims, and the expert testimony that went in depth about why a person of ordinary skill would understand that the heating element is expressly disclosed. The Board was rather generous here in looking to an inference, whereas when it came to the motion to amend, it was rather limited. Well, I think in both it looked at what a person of ordinary skill would understand is disclosed. So in the anticipation context, you had figures, including Figure 2, that expressly showed the heating element, that's that wicket-shaped element, being within the chamber. And this is what Dr. Dewey testified. You can see it's in parallel with the clips that hold the bottom part, the semi-hemispherical part of the chamber. The clips are directly in line with the top of that heating element. And that, I think, even if you were to look at it with fresh eyes, which this Court, of course, doesn't, you would conclude that that is within that chamber. And so Dr. Dewey explained why that had to be so, especially in light of the abstract and Claim 5, I would point the Court to, which noted that the heating element is what burns the tobacco, and the tobacco is burned within the chamber. It immediately follows that a person of ordinary skill would understand that the heating element is within the chamber. So all of that provides substantial evidence. Even if the Court were to, on its own, say another conclusion might be reasonable, and we don't think it is reasonable based on Hamill's disclosure, we think that that express disclosure is clear on its face and certainly supported by substantial evidence. Then turning to the written description question, the question is, again, whether it is disclosed. Can I ask you – I want to ask you some questions about the written description, actually. Do you agree that there has to be some way for ambient air to get into either Section 102 or Section 140 in order for the person who is inhaling at the mouthpiece to be able to get oxygen through the tobacco to make the combustion occur? There has to be ambient air coming from somewhere? There certainly has to be ambient air coming from somewhere. So this is my concern, is that the patent does say that there is some hole at Section 140 in Figure 3, but it doesn't say that there's a hole anywhere else. It doesn't say that there's a hole in Section 102. It only says that there's a hole in Section 140. So I don't know why there's supposed to be an inference that the hole that is described as being in Section 140 could be in that end section, 145, and getting air from Section 102 when Section 102 isn't described as having a hole. So there's no – how is someone going to be able to suck out of the air out of something that doesn't have a hole anywhere? So it's likely either in the end or in the side. And the point here is that it doesn't say which. But I don't understand technically, feasibility-wise, how it could be on the end cap, which is described as being a USB port. But even if it was a USB port that then had a hole above it or something like that, I don't see technically how it could work unless there's a hole somewhere in Element 102, because otherwise you're not getting new, fresh air in there. And you've got to get air in there some way for this device to work, because I think you need oxygen for there to be combustion. So I guess the point here is the application leaves it open. It doesn't say either of the following two things. It says there's a hole, though, in Section 140. Why couldn't a POSA, which is what their expert said, why couldn't a POSA understand that it must be in what I'll call the straw portion of Element 140, right, the outer part, which you concede, I think, that if there was a hole there, it would be an ambient air hole. Why doesn't it have to necessarily be there? Because otherwise the device wouldn't work. It could certainly be just as in Figure 4, for example. It could be going all the way through both portions, the portion that has the electronics and the portion that doesn't. But there is no disclosure for Figure 3, in contrast to the description of Figure 4, that there's a hole in Element 102. So you're inferring that there's a hole in Element 102 under your understanding of reading the embodiment of Figure 3, right? It simply doesn't say one way or the other. It says there's a hole. Let's look at the disclosure. For example, in paragraph 35, this is the disclosure that they rely on. It says, only a small hole or aperture, not shown, is located in the second pipe section so that air can be provided to the combustible material reservoir, which is positioned entirely within the second pipe section. So that means the reservoir is entirely within the second section, and there is a hole somewhere in that second section. It may be exterior, it may not be. And here's another example. But it has to be in a place that would make it work. Do you agree with me? Let me ask you something. This is a yes or no question. Do you agree that the specification in describing Figure 3 doesn't say that there's a hole in Element 102? That's correct. And it doesn't say it in describing Figures 1 or 2 either, does it? That's correct. And so here's also what it doesn't say. It doesn't say that the hole in the second section goes directly to the exterior. In contrast, if you look in Column 8, there is an example where the specification... Where is the ambient air coming from if the hole that is described as you identified it, the small aperture we're talking about, only a small aperture, where is the ambient air coming from if that hole is not in the side of the straw-like portion 140, you know, the cylinder part? If it's not in the side, then the testimony was, the expert testified it would be coming through the end. How? What was his basis? I saw that testimony. It's conclusory, I think. It's paragraph 53 on page 83026. He just says it is in the side. And he doesn't explain why, nor does he address the counter-argument that, hey, element 145, which is in the side, is a USB port. How can there be a hole there? That doesn't make any sense. Well, think of your iPhone. If you take out your iPhone, at the end, there's a USB port. Next to it, there are holes for air to pass through for the microphone. One doesn't preclude the other. Then, okay, I'll give you that. What about my second point, which is there's no disclosure of a hole anywhere else in the figure 3 environment? And you conceded earlier that there has to be some source of ambient air. So where does the patent disclose ambient air? It doesn't say there can't be a hole in the first section. So I have to say, because it doesn't say there can't be a hole, I'm going to infer that the hole that's described in the patent specification is one that could be in the end cap and would render the invention unworkable. I think because the hole that is disclosed doesn't say whether it comes directly from the outside or through another passage. For example, if we say there's a doorway into this courtroom, we don't know if that requires you to go through the lobby, the elevator, the hallway, to get to here, or if it's directly to the outside. You don't need to tell somebody there's also a doorway to the outside to be able to say that that's not disclosed one way or the other. And I just want to be clear with the Court. The question here is whether the negative limitation that they proposed, so the limitation has to disclose that it does not go through the first section. That's what they have to show is disclosed. And that's what the expert here said, here's another option. And to be clear, the Board didn't go all the way with our expert and say, yes, that is what actually would happen. The Board just simply had to say, given that the position of the hole in the second section isn't defined, indeed it's, quote, not shown, that isn't sufficient to disclose the negative limitation of not going through the first section. I see what you're talking about. What about, the Board made another holding on page 35. It said that, in its view, that patent specification doesn't disclose to a person of ordinary skill, the inventor possessed providing a small hole directly to the external atmosphere, that is in the straw portion of element 140, as opposed to merely providing a hole between the pipe sections. So I have to, the problem I'm having, you know what the problem is, I understand your argument and I appreciate you very much for very directly answering my questions. The concern I have is that where another hole is not described as being in element 102, why wouldn't a person of ordinary skill in the art understand this hole, which is described as a hole to provide air to the mouthpiece going through the tobacco, why wouldn't they understand it to be an ambient air hole so that the invention could operate? Since no other hole is described, it requires me to make an assumption that, oh, they must have meant to describe another hole. Let me give you another possibility. Okay. The hole might go from the outside into the second section, go into the first section, come back into the second section. No hole would be needed in the first section, and yet the air passageway would pass it through. But the spec doesn't describe that. Sure. And that's, I think, what, if the Court would consider. In order for me to agree with you, I have to make inferences about something that the specification doesn't even describe. Does the written description allow me to do that? Is it so rigid against a person possessing an invention that I'm supposed to assume things about an embodiment that aren't even described on their face in the patent? Well, a couple of thoughts there, Your Honor. In Robinson, for example, that's the prior art that they were trying to get around by including this express kind of exclusive passageway only to the second section. Right? Because in Robinson, if you recall, it did go all the way through. So it's not crazy to think that it could go all the way through based on Robinson. I understand it could. It could, but it's not disclosed. We're supposed to look at the four corners of the description. And I don't know if they'll get past Robinson with this claim limitation, given obviousness. You know, that's not the issue before us. The issue is whether a person of ordinary skill in the art would have thought that they possessed the idea of an ambient air hole when no other hole was described. And it's undisputed that there must be ambient air coming from somewhere. And it's the only hole disclosed. Counsel, do you want to spend a little more time defending the main issue? The first issue? Certainly, Your Honor. One final point on that before we turn. I would point the Court to the Novartis decision, where this Court said silence is not disclosure. So there, there was a negative limitation. You had to have no loading doses in the medical method at issue. And in that case, the specification left ambiguous. There might have been medical or, excuse me, there might have been loading doses or there might not have been loading doses. But because the limitation required no loading doses, you had to expressly or very clearly disclose you shall not have loading doses. And that's what is missing in the disclosure here. There is no, thou shalt not go through the first pipe section at any point in this passageway. As to the first, as to the first issue, I think we've covered it fairly completely. I'm happy to answer any questions that the Court... Did the Court make and express a finding that Hamel expressly discloses a heating element fixed in the combustible material reservoir? Yes. Yes, I know that's one of their main arguments, that it didn't actually do it. Where is that? Sure, if we can go to page A22 and 23. I'll start with that and maybe walk through that in the subsequent pages. So at page A22, this is where the Board is kind of prefacing its analysis and it says, quote, Hamel discloses each of the limitations, end quote. And then it goes on, on page A24, and this is now where it's talking about the heating element in particular. It rejects H.C.'s argument that this is somehow ambiguous or incomplete. Hamel's not ambiguous. It's not incomplete. And then it goes on to say further at page A25 that a person of ordinary skill, quote, would have inferred the shape and location of the heating element in Figure 2 based on the labeled heating element in the exploded view of Figure 3. And the Board elsewhere said at A23 that this was all based on, as the Court noted earlier, Petitioner's arguments and evidence, including, not exclusively, but including the figures and Dr. Deavy's testimony. Does Dr. Deavy concede that those things are not accurate, that Hamel does not expressly disclose the structure that you need there? No. So what my friend was talking about is Dr. Deavy's testimony in his deposition, and this is at pages A3430 to 3435, regarding the existence of holes in that chamber. So, first of all, holes aren't claimed. That's not part of the claim element. That's not something that had to be shown, expressly disclosed. But moreover, he explained that holes, a person of ordinary skill, given this wicket-shaped heating element, would understand that those legs go somewhere, right? They go through the chamber down to the battery and connect to the battery. Otherwise, they couldn't provide the electricity, and that's on the face of Figures 2 and 3 and confirmed by the disclosure. So he didn't concede it. All he conceded was that Hamel didn't use the word hole. But that isn't the issue and was amply supported by substantial evidence when the board found the heating element fixed in the combustible material reservoir. And so for those reasons, we would ask the court to affirm the board's decision. Thank you, counsel. Mr. Fisher has a little time for response. So in response to your question, Judge Stark, on A3035 through... Really, all the way through 3049, that's Dr. Deevee,  explaining why those skilled in the art knew not to permit air to flow through the electronics, recondensation do damage to the electronics, and that one skilled in the art would have understood that the air would not flow through the electronics section. So, again, we were talking about... Judge Stahl, you were questioning about whether the specification says that there is an aperture in the first section. There's not. And the specification itself clearly states that there's a small hole or aperture in the second portion. So that is disclosed, and that's where the... Based on what Dr. Deevee testified about the electronics, one would have read the specification to see that the hole comes in the side and flows out through the mouthpiece. And this really gets back to the bigger theme. It's when it's close enough, good enough. And I think the board erred in its anticipation analysis in its decision that Appendix 24, it says the dispositive question regarding anticipation is whether a person of ordinary skill in the art would reasonably understand or infer from the reference that every element is disclosed. That's not the test under Theracents. Wasika is getting to whether a feature that was not expressly in a reference should be inferred. And it's really like an inherency argument. That's not what this case is about. The law is clear that for anticipation, every limitation must be disclosed expressly or inherently within the four corners. And as to the sufficiency of that reference, Wasika itself says the reference was at best unclear whether its transmissions occurred at an unchanging fixed frequency. Here, it's at best unclear whether the heating element is fixed within the combustible material reservoir. At best unclear. And the Placemark case says our precedence held that drawings can be used as prior art, as Philip Morris attempted to do here, without referring to the surrounding text, because there is no text here for Hamel, only if prior art features are clearly disclosed in the drawings. And they have to be clear enough to describe the limitation as set forth in the claim. Can I ask you a question about written description? And your claim construction is that air can't come from the first section, right? It's a negative limitation is what the board says, right? And then the board says there isn't written description support for that. That's one of the things that Philip Morris is emphasizing on appeal, right? To support the board's written description finding. So how does that happen? I guess my question is, is that still your position? That the board's, you know, that it's the negative limitation? Do you think the board's finding that there's no written description support is limited to your claim construction with this negative limitation? I'll say this a bit delicately. There was no claim construction in the motion to amend. It's our position that based on the teaching in the specification, paragraph 35 says, quote, a small hole where aperture is in the second pipe section. Paragraph 37 says, a passageway to permit air to flow between the mouthpiece receiver and the combustible material reservoir in the second section is located within the second pipe section. That to us is very clear that when you're connecting a USB connector to a USB connector and the passageway is within the second pipe section and the air inlet is in the second pipe section, it's got to go through the second pipe section and not through the mouthpiece. That's not claim construction unless, you know, maybe the claim as a whole requires that, but that's not, that's a different issue than what we argued. That's what the claim as amended would require and supported by the specification. Can I clarify that the board said that it was your position that the aperture has to exclude air passage through the first pipe section. That was your position in your motion to amend, was it not? I'm quoting from A33, yes. In the motion to amend, we made the amendment to put the aperture in the second pipe section. And to exclude air passage from the first pipe section. That was your position, was it not, in the motion to amend? When we argued for validity of what that claim, that claim as a whole would have required, yes. The Robinson with the flow through would not meet that limitation. And then we also argued that based on their testimony that that's how one skill in the art would have read the specification in the first place that one skill in the art would not see or want the air to go through the electronics. Thank you. Thank you, counsel. We'll take some submissions.